## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Roger Severino, | |
| *Plaintiff*, | |
| *v.* | Civil Action No. 1:21-cv-314 |
| Joseph R. Biden Jr., *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM

Defendants Joseph R. Biden, Jr., Catherine M. Russell, Gautam Raghavan, and the United States (collectively "Defendants") move to dismiss the complaint (ECF No. 1) for lack of subject matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively.  For the reasons below, Defendants' motion should be granted and the case should be dismissed.  A proposed order is attached.

Dated: May 4, 2021                                  Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

CHRISTOPHER R. HALL
*Assistant Branch Director*

/s/ *Christopher D. Dodge*
CHRISTOPHER D. DODGE
(MA Bar No. 696172)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530

Telephone: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Roger Severino,

      *Plaintiff,*

*v.*

Joseph R. Biden, Jr., *et al.*,

      *Defendants*.

Civil Action No. 1:21-cv-314

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

I.     The Administrative Conference of the United States .......................................... 2

II.    Severino's Appointment, Reappointment, and Removal As A Member of the ACUS Council ............................................................................................................ 5

III.   The White House Presidential Personnel Office ............................................... 6

LEGAL STANDARD ................................................................................................. 7

ARGUMENT ............................................................................................................. 8

I.     Severino's Claim Is Not Redressable Because He Cannot Obtain Injunctive or Declaratory Relief Against the President And His Assistants ............................ 8

     A.    Federal courts lack jurisdiction to subject the President to injunctive or declaratory relief. ................................................................................ 9

     B.    Injunctive or declarative relief against the President's assistants cannot redress Severino's injury ...................................................................... 12

II.    The President May Remove ACUS Council Members At His Discretion ...................... 20

     A.    The President may remove ACUS Council members under the Administrative Conference Act. ................................................................ 21

     B.    Severino offers no reason to read removal protections into ACUS's governing statute. .......................................................................... 26

     C.    The constitutional avoidance canon further counsels against reading removal protections into the Administrative Conference Act. ............................ 35

CONCLUSION ......................................................................................................... 37

i

# TABLE OF AUTHORITIES

**Cases**

*Al-Aulaqi v. Obama,*
  727 F. Supp. 2d 1 (D.D.C. 2010) ................................................................. 14, 31, 32

*Applicability of the Emoluments Clause to Nongovernmental Members of ACUS,*
  34 Op. O.L.C. 183 (2010) ........................................................................ 4, 31, 32

*Arlington v. FCC,*
  569 U.S. 290 (2013) ........................................................................................ 28

*Armstrong v. Bush,*
  924 F.2d 282 (D.C. Cir. 1991) ................................................................ 26, 27, 29, 35

*Armstrong v. EOP,*
  90 F.3d 553 (D.C. Cir. 1996) ........................................................................... 14

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ......................................................................................... 8

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993) ........................................................................... 14

*Barnett v. Obama,*
  No. SACV09-0082 DOC(ANX), 2009 WL 3861788 (C.D. Cal. Oct. 29, 2009),
   *aff'd sub nom. Drake v. Obama,* 664 F.3d 774 (9th Cir. 2011) ............................................. 19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................... 8, 18

*Carlucci v. Doe,*
  488 U.S. 93 (1988) ......................................................................................... 21

*Chamber of Com. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ...................................................................... 17, 19

*Cheney v. U.S. Dist. Ct. for D.C.,*
  542 U.S. 367 (2004) ........................................................................................ 27

*Conley v. Gibson,*
  355 U.S. 41 (1957) ......................................................................................... 18

*Const. Separation of Powers Between the President & Cong.,*
  20 Op. O.L.C. 124 (1996) ........................................................................... 26, 34

*CREW v. Off. of Admin.*,
566 F.3d 219 (D.C. Cir. 2009) ............................................................... 14

*CREW v. Trump*,
438 F. Supp. 3d 54 (D.D.C. 2020) .......................................................... 9

*Ctr. for Democracy & Tech. v. Trump*,
No. 1:20-CV-01456 (TNM), 2020 WL 7318008 (D.D.C. Dec. 11, 2020) ............... 18

*Dalton v. Specter*,
511 U.S. 462 (1994) .............................................................................. 12

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015) ........................................................................... 26, 34

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) ......................................................... 19

*Drake v. Obama*,
664 F.3d 774 (9th Cir. 2011) ................................................................. 19

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) .............................................................................. 7

*FEC v. NRA Pol. Victory Fund*,
6 F.3d 821 (D.C. Cir. 1993) ................................................................... 30

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ...................................................................... *passim*

*Free Enter. Fund v. Pub. Co. Acct. Bd.*,
561 U.S. 477 (2010) ...................................................................... 27, 36, 37

*Gomez v. United States*,
490 U.S. 858 (1989) .............................................................................. 36

*Grand Lodge of Fraternal Ord. of Police v. Ashcroft*,
185 F. Supp. 2d 9 (D.D.C. 2001) ............................................................. 7

*Holdover & Removal of Members of Amtrak's Reform Bd.*,
27 Op. O.L.C. 163 (2003) ...................................................................... 34

*Humane Soc'y of the United States v. Babbitt*,
46 F.3d 93 (D.C. Cir. 1995) ................................................................... 17

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ............................................................................................... *passim*

*In re Hennen*,
    38 U.S. (13 Pet.) 230 (1839) ................................................................................ 21, 22

*Kaspersky Lab, Inc. v. DHS*,
    909 F.3d 446 (D.C. Cir. 2018) ...................................................................................... 5

*Keim v. United States*,
    177 U.S. 290 (1900) ...................................................................................... 21, 25, 33

*Kendall v. U.S. ex rel. Stokes*,
    37 U.S. (12 Pet.) 524 (1838) ..................................................................................... 10

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) .................................................................................................... 9

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) .................................................................................................. 12

*Lovitky v. Trump*,
    918 F.3d 160 (D.C. Cir. 2019) .................................................................................. 12

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................. 7, 8

*Manning v. Esper*,
    No. CV 12-1802 (CKK), 2019 WL 281278 (D.D.C. Jan. 22, 2019) ........................... 5

*Marbury v. Madison*,
    5 U.S. (Cranch) 137 (1803) ................................................................................ 11, 13

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ............................................................................................ 11, 15

*Metz v. BAE Sys. Tech. Solutions & Servs., Inc.*,
    774 F.3d 18 (D.C. Cir. 2014) ................................................................................... 12

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866) ................................................................... 9, 10, 11, 15

*Morgan v. Tenn. Valley Auth.*,
    115 F.2d 990 (6th Cir. 1940) ................................................................................... 26

iv

*Morrison v. Olson*,
   487 U.S. 654 (1988) ............................................................................... 28, 29

*Myers v. United States*,
   272 U.S. 52 (1926) ....................................................................... *passim*

*Narragansett Indian Tribal Historic Pres. Off. v. FERC*,
   949 F.3d 8 (D.C. Cir. 2020) ................................................................... 16, 33

*Nat'l Treasury Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ....................................................................... 12

*Nat'l Wildlife Fed'n v. United States*,
   626 F.2d 917 (D.C. Cir. 1980) ....................................................................... 12

*Newdow v. Bush*,
   355 F. Supp. 2d 265 (D.D.C. 2005) ........................................................ 10, 19

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ................................................... 9, 15, 16, 19

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ........................................................................................ 11

*Parsons v. United States*,
   167 U.S. 324 (1897) ....................................................................... 22, 23, 24, 33

*PHH Corp. v. CFPB*,
   881 F.3d 75 (D.C. Cir. 2018) ........................................................................ 24

*Pievsky v. Ridge*,
   98 F.3d 730 (3d Cir. 1996) ..................................................................... 22, 24

*Porter v. Coble*,
   246 F. 244 (8th Cir. 1917) ............................................................................ 23

*Raines v. Byrd*,
   521 U.S. 811 (1997) ......................................................................................... 8

*Removability of the Fed. Coordinator for Alaska Nat. Gas Transp. Projects*,
   21 Op. O.L.C. 135 (1997) .............................................................................. 26

*Richardson v. United States*,
   526 U.S. 813 (1999) ................................................................................. 36, 37

*SEC v. Blinder, Robinson & Co.*,
   855 F.2d 677 (10th Cir. 1988) ............................................................. 30

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ................................................................... *passim*

*Shurtleff v. United States*,
   189 U.S. 311 (1903) ......................................................... 21, 25, 26, 30

*Singleton v. Wulff*,
   428 U.S. 106 (1976) .............................................................................. 9

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ......................................................... 14

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .......................................................................... 8

*Stanley v. DOJ*,
   423 F.3d 1271 (Fed. Cir. 2005) ..................................................... 22, 24

*Stanley v. Gonzales*,
   476 F.3d 653 (9th Cir. 2007) .............................................................. 22

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .............................................................................. 17

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ....................................................... *passim*

*Tulare Cnty. v. Bush*,
   185 F. Supp. 2d 18 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) ............................ 12

*Turner v. U.S. Agency for Glob. Media*,
   No. CV 20-2885 (BAH), 2020 WL 6822780 (D.D.C. Nov. 20, 2020) ..................................... 9

*U.S. ex rel. Frizzell v. Newman*,
   42 App. D.C. 78 (D.C. Cir. 1914) ...................................................... 23

*United States v. Nixon*,
   418 U.S. 683 (1974) ............................................................................ 27

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021) ............................................................................ 8

*Whitman v. Am. Trucking Ass'ns*,
 531 U.S. 457 (2001) ........................................................................... 27

*Wiener v. United States*,
 357 U.S. 349 (1958) ................................................................... *passim*

**Constitutional Provisions**

U.S. Const., art. III, § 2 ...................................................................... 8

U.S. Const., art. III, § 2, cl.2 ............................................................. 11

**Statutes**

3 U.S.C. § 105 ................................................................................... 14

5  U.S.C. § 551 .................................................................................. 14

5 U.S.C. § 591 ..................................................................................... 2

5 U.S.C. § 593 .......................................................................... *passim*

5 U.S.C. § 594 ..................................................................................... 2

5 U.S.C. § 595 .......................................................................... *passim*

5 U.S.C. § 704 ................................................................................... 12

12 U.S.C. § 5491 ......................................................................... 24, 37

13 U.S.C. § 141 ................................................................................. 18

15 U.S.C. § 41 ............................................................................. 30, 33

15 U.S.C. § 7211 ............................................................................... 37

28 U.S.C. § 2201 ............................................................................... 12

44 U.S.C. § 3502 ............................................................................... 34

Act of Congress of July 12, 1876,
 19 Stat. 78 (1876) ...................................................................... 23, 24

Administrative Conference Act, Pub. L. 88-499, 78 Stat. 615 (1964),
 codified at 5 U.S.C. §§ 591-596 ..................................................... 1, 2

War Claims Act of 1948,
 62 Stat. 1240 .................................................................................................. 30, 33

**Rules**

Federal Rules of Civil Procedure 12(b)(1)................................................................ 5, 7, 9

Federal Rules of Civil Procedure 12(d) ......................................................................... 5

**Regulations**

12 C.F.R. § 790.2 (1996) ............................................................................................. 18

Executive Order 10,934, 26 Fed. Reg. 3233 (Apr. 13, 1961)................................... 4, 32

**Legislative Authorities**

H.R. Rep. No. 88-1565 (1964).............................................................................. *passim*

S. Rep. No. 88-621 (1963) ..................................................................................... 31, 32

Madison, 1 Annals of Cong. 463 (1789) ...................................................................... 11

**Other Authorities**

ACUS Council, https://www.acus.gov/directory/council. ............................................... 6

ACUS, *About ACUS,*
 https://www.acus.gov/administrative-conference-united-states-acus....................... 35

Adrian Vermeule, *Conventions of Agency Independence,*
 113 Colum. L. Rev. 1163 (2013) ...................................................................... 25, 26

Antonin Scalia & Stephen G. Breyer, *Reflections on the Administrative Conference,*
 83 Geo. Wash. L. Rev. 1205 (2015) ................................................................. 30, 31

Bradley H. Patterson, *The White House Office of Presidential Personnel,*
 2001 Pres. Stud. Q. 415 ................................................................................. 6, 7, 13

Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2956 ...................... 18

Cynthia R. Farina, *False Comfort and Impossible Promises: Uncertainty, Information Overload,
 and the Unitary Executive*, 12 U. Pa. J. Const. L. 357 (2010)........................... 13, 14

Douglas S. Onley, *Treading on Sacred Ground: Congress's Power to Subject White House
 Advisers to Senate Confirmation*, 37 Wm. & Mary L. Rev. 1183 (1996) ............... 13

James P. Pfiffner, *Recruiting Executive Branch Leaders: The Office of Presidential Personnel*,
Brookings Institute (Mar. 1, 2001), https://www.brookings.edu/articles/recruiting- executive -
branch- leaders- the- office- of-presidential-personnel/ ........................................................... 6

Jennifer L. Selin & David E. Lewis,
*Sourcebook of United States Executive Agencies* (2d ed. 2018)........................................ 34, 35

Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive
Agencies)*, 98 Cornell L. Rev. 769 (2013) .............................................................................. 35

Lauren C. Bell, *Federal Judicial Selection in History and Scholarship*,
96 Judicature 296 (2013) ..................................................................................................... 6, 13

Michael A. Livermore, *Political Parties and Presidential Oversight*,
67 Ala. L. Rev. 45 (2015) ........................................................................................................ 7

President Trump Appoints Three New Members to the Council of the Administrative Conference
of the United States (July 24, 2020), https://www.acus.gov/newsroom/news/president-trump-
appoints-three-new-members-council-administrative-conference-united ................................. 5

Senate Committee on Homeland Security and Governmental Affairs, United States Government
Policy and Supporting Positions (2016), https://www.govinfo.gov/content/pkg/GPO-
PLUMBOOK-2016/pdf/GPO-PLUMBOOK-2016.pdf ...................................................... 7, 14

The Executive Branch, White House, https://www.whitehouse.gov/about-the-white-house/our-
government/the-executive-branch/ ............................................................................................ 7

**INTRODUCTION**

Plaintiff Roger Severino was re-appointed to the Council for the Administrative Conference of the United States ("ACUS") on January 16, 2021 by President Trump.  On February 2, he was advised that President Biden had requested his resignation, and that he would be terminated the next day if he did not resign voluntarily.  Severino did not resign; he instead filed this lawsuit on February 3, asking this Court for various declaratory and injunctive relief, including to enjoin any action terminating him, or to require his reappointment should he be terminated before the Court could intervene.  President Biden terminated Severino's appointment to ACUS the same day, and accordingly much of Severino's requested relief is now moot.  The non-moot portions of Severino's complaint continue to seek extraordinary relief: an order declaring that the President unlawfully removed him from his unpaid, part-time position on the ACUS Council and compelling the President to reappoint him to that post.  But Severino's request falls outside the Court's subject-matter jurisdiction and lacks merit in any event.

First, Severino lacks standing to pursue a request for reappointment because his supposed injury is not redressable.  Longstanding separation-of-powers principles bar federal courts from directly enjoining or issuing declaratory relief against the President.  And while Severino also sues two of the President's assistants, no relief against these individuals can remedy the alleged harm because the President's assistants have no independent duties with respect to ACUS.  Under ACUS's governing statute, the Administrative Conference Act (5 U.S.C. §§ 591-596), the President alone has the power to appoint and remove Council members.  Because federal courts lack the authority to issue the sole relief that might remedy Severino's alleged harm, his claims are not redressable and should be dismissed for lack of jurisdiction.

Second, even if his claims could be remedied by a federal court, Severino is incorrect that the President lacked the statutory or constitutional authority to remove him.  Through the Administrative Conference Act, Congress chose to grant the President alone the power to appoint ACUS Council members, without need of Senate confirmation.  Barring clear and explicit language from Congress to the contrary, the appointing power in a statute is presumed under

1

longstanding rules of statutory interpretation to also encompass the power of removal.  Congress supplied no limitation on the President's removal authority here.  Thus, as the statutory appointing power chosen by Congress, the President also possesses the statutory power to remove Council members.  At the same time, no constitutional or statutory reason exists to read removal protections into a statute where Congress chose not to include them, particularly when Congress also chose to grant the President alone the power of appointment.  ACUS's duties, structure, and history all confirm that this is not the rare case where a court should read removal protections into a statute over Congress's silence.  Indeed, to do so would itself raise weighty constitutional questions about the President's constitutional removal power, and the canon of constitutional avoidance therefore further warrants rejecting Severino's claims.  Because the President possessed the statutory authority to terminate Severino's service, and no constitutional bar precluded his exercise of that authority, the complaint fails to state a claim for which relief can be granted.

## BACKGROUND

### I.       The Administrative Conference of the United States

Congress created ACUS in 1964 through passage of the Administrative Conference Act ("Act").  *See generally* Administrative Conference Act, Pub. L. 88-499, 78 Stat. 615 (1964) (codified at 5 U.S.C. §§ 591-596).  ACUS's purpose is to promote efficiency, public participation, and the use of science in the regulatory process.  *See generally* 5 U.S.C. § 591 (describing the purposes of ACUS); *see also* Establishing an Administrative Conference of the United States, H.R. Rep. No. 88-1565 at 4 (1964) (purpose of ACUS is to "provide permanent machinery whereby the Federal agencies, with assistance from non-Government authorities on administrative practice, will be able to formulate recommendations to improve Government procedures.").  To that end, Congress empowered ACUS to "study the efficiency, adequacy, and fairness of the administrative procedure used by administrative agencies . . . and make recommendations to administrative agencies."  5 U.S.C. § 594.  While ACUS's enumerated powers permit it to recommend improvements to the administrative process, it possesses no rulemaking, investigatory, enforcement, or adjudicative authority.  *See generally id.*; *see also* Compl. ¶¶ 9, 29, ECF No. 1.

ACUS is comprised of a Chairman, an eleven-member Council, and various other members who, when meeting together in plenary session, constitute the Assembly.  *See* 5 U.S.C. §§ 593, 595.  The Chairman, who sits on and leads the Council, is appointed to a five-year term by the President with the advice and consent of the Senate.  *Id.* §§ 593(b)(1), 595(b).  The Chairman's role is a full-time position entitled to compensation at a statutory rate.  *Id.* § 593(b)(1).  The Chairman is the "chief executive" of ACUS and possesses powers related to administering ACUS and pursing its advisory mission.  *See id.* § 595(c)(1)-(16).

The remaining ten members of the Council are appointed by the President, without Senate confirmation, for three-year terms.  *See* 5 U.S.C. § 595(b).  These members do not serve in full-time roles and are not paid for their service.  *Id.* § 593(c).  The President may, at his discretion and without Senate confirmation, "designate a member of the Council as Vice Chairman." *Id.* § 595(b).  The Vice Chairman, like all other Council members except the Chairman, is appointed to a three-year term and is not compensated.  *Id.* §§ 593(c), 595(b).  To facilitate a mix of public and government Council members, the Act requires that "not more than one-half [of Council members] shall be employees of a Federal regulatory agency or Executive departments." *Id.* § 595(b); *see also* H.R. Rep. No. 88-1565 at 3 (explaining this requirement ensured a balance of Government and non-Government members of the Council).  The Act provides that a Council member's service terminates "when a change in his employment status would make him ineligible for Council membership under the conditions of his original appointment." 5 U.S.C. § 595(b).

The Council's powers principally concern the governance of ACUS itself, and do not include the power to submit recommendations to other federal agencies.  *See generally* 5 U.S.C. § 595(b)(1)-(8).  For example, the Council has the power to take the following actions as to ACUS: (1) set the time and place of ACUS's plenary sessions; (2) propose bylaws and regulations; (3) make recommendations to ACUS and its committees; (4) receive and consider reports from ACUS committees; (5) designate a Council member to preside over the Council when the Chairman and Vice Chairman (if one is designated) are incapacitated; (6) designate additional officers; (7)

approve or revise the budgetary proposals of the Chairman; and (8) exercise additional powers delegated by the Assembly.  *Id.*

The Assembly is comprised of "not more than 101 nor less than 75 members," including the eleven members of the Council.  5 U.S.C. § 593(a).  Several government officers are deemed members of the Assembly, including the head of each independent regulatory board or commission and the head of each Executive Department (or their designees).  *Id.* § 593(b)(2)-(3).  The Chairman may also appoint members of the Assembly from outside the government, with the approval of the Council, for two-year terms provided that such members are "at no time [] less than one-third nor more than two-fifths of the total number of members."  *Id.* § 593(b)(6).  The Assembly is empowered to study administrative procedure and to adopt and make recommendations to agencies to improve such procedure.  *See generally id.* § 595.  The Assembly also "has ultimate authority over all activities of the Conference."  *Id.* § 595(a).

Prior to the creation of ACUS as a permanent body in 1964, several temporary Conferences existed within the Executive Branch.  *See* H.R. Rep. No. 88-1565 at 8-9, 19-27.  In response to the growth of the administrative state, President Eisenhower established a temporary Administrative Conference in 1954-1955.  *Id.* at 8, 19-21.  President Kennedy created another temporary Conference in 1961-1962 through Executive Order 10,934.  *Id.* at 8.  President Kennedy's order created "a Council of 11 members named by him and a general membership from the executive departments, the administrative agencies, the practicing bar, and other persons specially informed."  *Id.* at 26.  The temporary Conference created by President Kennedy also recommended the creation of a permanent Conference to provide "means by which agencies in the Federal Government may cooperatively, continuously, and critically examine their administrative processes and related organizational problems."  *Id.* at 27.  The Administrative Conference Act, passed shortly thereafter, modeled ACUS on the temporary Conference established under President Kennedy's executive order.  *Id.* at 2-3; *see also Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 34 Op. O.L.C. 181, 183 (2010) ("Congress established a structure much like the one that President Kennedy had established.").

## II.     Severino's Appointment, Reappointment, and Removal As A Member of the ACUS Council

In March 2017, then-President Trump appointed Severino to serve as Director of the Office of Civil Rights in the Department of Health and Human Services.  *See* Declaration of Christopher D. Dodge, Ex. A.[1]  On July 24, 2020, President Trump appointed Severino, still then serving as Director, to a government Council member position at ACUS.  *See* President Trump Appoints Three New Members to the Council of the Administrative Conference of the United States (July 24, 2020), *available at* https://www.acus.gov/newsroom/news/president-trump-appoints-three-new-members-council-administrative-conference-united.  As a member of the Council, Severino's appointment did not require confirmation by the Senate and he was not entitled to any compensation for his part-time service.  *See* 5 U.S.C. §§ 593(c), 595(b).

Severino resigned his position as Director and left government service on January 15, 2021, shortly before the change in presidential administration.  *See* Dodge Decl., Ex. A.  The next day, January 16, 2021, President Trump re-appointed Severino as a member of the ACUS Council, this time as a public nongovernmental member.  *See* Compl. ¶ 21.  Severino's reappointment, again, required no Senate confirmation and was executed through an appointment affidavit conveyed by the White House Presidential Personnel Office.  *See* Dodge Decl., Ex. B.

On February 2, 2021, Gautam Raghavan, Deputy Director of the White House Presidential Personnel Office, emailed Severino on behalf of President Biden asking for his resignation.  *See* Compl. ¶ 23, Ex. B.  Severino declined to resign.  *Id.* ¶¶ 24, 26, Ex. B.  Severino's service was

---

[1] The Court may take judicial notice of the exhibits cited by Defendants because they contain facts not subject to reasonable dispute from sources, such as government records or emails sent directly to Severino and his colleagues, whose accuracy cannot reasonable be questioned.  *See Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446, 464 (D.C. Cir. 2018) (collecting authority).  Further, Defendants rely on these exhibits to show that Severino has, in fact, been removed from the ACUS Council since filing this lawsuit, which bears on Defendants' Rule 12(b)(1) arguments concerning the redress necessary for Severino to show standing.  *See infra* Section II.A; *see also Manning v. Esper*, No. CV 12-1802 (CKK), 2019 WL 281278, at *4 (D.D.C. Jan. 22, 2019) (noting Rule 12(d) "does not prohibit" consideration of extrinsic materials "in connection with a motion under Rule 12(b)(1)").

terminated the next day.  *See* Dodge Decl., Ex. D; *see also* Compl. ¶¶ 23-24, Ex. 2.[2]  On February

4, 2021, the Executive Director of ACUS emailed the agency's staff informing them that Severino

had been removed from the Council and had filed the instant lawsuit.  *See* Dodge Decl. Ex. C.[3]

### III.   The White House Presidential Personnel Office

The White House Presidential Personnel Office ("PPO") advises and assists the President

in filling vacancies in leadership positions throughout the federal government.   *See* Lauren C.

Bell, *Federal Judicial Selection in History and Scholarship*, 96 Judicature 296, 299 (2013); *see*

*generally* Bradley H. Patterson, *The White House Office of Presidential Personnel*, 2001 Pres.

Stud. Q. 415.  The PPO is reconstituted with every new presidential administration and is tasked

with identifying non-career Executive Branch leaders.  *See* James P. Pfiffner, *Recruiting Executive*

*Branch Leaders: The Office of Presidential Personnel*, Brookings Institute (Mar. 1, 2001),

*available at* https://www.brookings.edu/articles/recruiting- executive - branch- leaders- the-

office- of-presidential-personnel/.[4]  The PPO recruits for "the most important [positions] in the

executive branch," including "the cabinet and subcabinet, leaders of independent agencies, and

regulatory commissioners," along with ambassadors.  *Id.*; *see also* Patterson, 2001 Pres. Stud. Q.

at 416-417 (listing noncareer positions subject to political appointment).   As a result, PPO

leadership is typically identified prior to a president's inauguration so that potential nominees can

---

[2] In tandem with the email to Severino, Raghavan sent identical emails to three other recently-appointed members of the Council—Jennifer Dickey, Daniel Epstein, and Andrew Kloster.  *See* Dodge, Decl., Exs. E-G; *see also* Compl. ¶ 27.  Dickey agreed to resign, recognizing the President's "prerogative" to remove members of the Council.  *See* Dodge, Decl., Ex. E at 2. Epstein and Kloster did not resign and were subsequently terminated.  *Id.*, Exs. C, F, G.  To date, Severino is the only former member of the Council to have filed suit seeking reinstatement.

[3] The present Council members are Ronald A. Cass, Jeffrey M. Harris, Donald F. McGahn II, Michael H. McGinley, Matthew E. Morgan, Adrian Vermeule, and Matthew L. Wiener.  *See* ACUS Council, *available at* https://www.acus.gov/directory/council.  Mr. Wiener was appointed as Vice Chairman by President Biden.  Mr. Cass was twice appointed by President Obama and then reappointed by President Trump.  The remaining five members were all appointed by President Trump.  With the exception of Mr. Wiener, each current member of the Council is a public, nongovernmental member.  ACUS does not presently have a Senate-confirmed Chairman.

[4] By comparison, the Office of Personnel Management is a permanently existing agency responsible for recruiting and promoting individuals within the career civil service.  *Id.*

be prepared during the presidential transition period.  *See* Patterson, 2001 Pres. Stud. Q. at 423

(explaining the need to constitute the OPP immediately following the election); *see also* Pfiffner,

*Recruiting Executive Branch Leaders* ("The personnel office must be ready to go the day after the

election" as "advanced planning is crucial").

The PPO is located directly within the White House Office, which itself is part of the larger

Executive Office of the President.  *See* Michael A. Livermore, *Political Parties and Presidential*

*Oversight*, 67 Ala. L. Rev. 45, 55 n.43 (2015); *accord* Senate Committee on Homeland Security

and Governmental Affairs, United States Government Policy and Supporting Positions 2 (2016)

("Plum   Book"),   *available   at*   https://www.govinfo.gov/content/pkg/GPO-PLUMBOOK-

2016/pdf/GPO-PLUMBOOK-2016.pdf.   The White House Office and Executive Office of the

President have "traditionally been home to many of the President's closest advisors."  *See* The

Executive Branch, White House, *available at* https://www.whitehouse.gov/about-the-white-

house/our-government/the-executive-branch/.   These advisors typically "are appointed with full

Presidential discretion."  *Id.*  The Defendants here are no exception.  Catherine M. Russell, the

Director of PPO, is a presidential appointee not subject to Senate confirmation who also has the

title of Assistant to the President.  *See* Plum Book at 2.  Gautam Raghavan, the Deputy Director

of PPO, was likewise appointed by the President without Senate approval and has the additional

title of Deputy Assistant to the President.  *Id.* at 3.

## LEGAL STANDARD

Defendants move to dismiss the complaint for lack of subject matter jurisdiction under

Federal Rule of Civil Procedure 12(b)(1).  A federal court is presumed to lack jurisdiction until

jurisdiction is established in a case.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S.

546, 551 (2005).  The Court must ensure itself of jurisdiction before proceeding.  *See Grand Lodge*

*of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) ("[A] Rule 12(b)(1)

motion imposes on the court an affirmative obligation to ensure that it is acting within the scope

of its jurisdictional authority.").   The party invoking the court's jurisdiction bears the burden of

demonstrating that jurisdiction exists at all times throughout the case.  *See Lujan v. Defs. of*

*Wildlife*, 504 U.S. 555, 561 (1992).

Defendants also move to dismiss the complaint for failure to state a claim under Rule 12(b)(6). When considering such a motion, the Court must accept as true all well-pleaded facts and allegations in the complaint, but does not need to accept a plaintiff's legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679 (citing *Twombly*, 550 U.S. at 556).

## ARGUMENT

### I.  Severino's Claim Is Not Redressable Because He Cannot Obtain Injunctive or Declaratory Relief Against the President And His Assistants

"The Constitution confers limited authority on each branch of the Federal Government." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546 (2016). The judicial power "extends only to 'Cases' and 'Controversies,'" and "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Id.* at 1537 (quoting U.S. Const., art. III, § 2; *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). To establish the existence of a 'Case' or 'Controversy,' a plaintiff must meet the "irreducible constitutional minimum" for standing, which requires showing that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-561). Accordingly, "no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021).

The majority of Severino's requested relief is now moot because he has been removed from the Council for over three months. The remaining, and extraordinary, relief that Severino seeks— a judicial order compelling the President and his close aides to reappoint him to his former position as a nongovernment ACUS Council member, and to declare his removal unlawful—falls outside

federal courts' authority.  *See* Compl. ¶ 32.  Under longstanding separation-of-powers principles, courts cannot directly enjoin or issue declaratory relief against the President.  And Severino's claim cannot be redressed by issuing similar relief against Russell or Raghavan who, as assistants to the President, lack any independent authority to appoint or remove Severino from the ACUS Council.  Because courts lack the power to grant Severino the only relief that will now redress his alleged injury, the complaint should be dismissed for lack of jurisdiction.  *See CREW v. Trump*, 438 F. Supp. 3d 54, 69 n.14 (D.D.C. 2020) (dismissing case under Rule 12(b)(1) where claims were "not redressable" because the "court lack[ed] the power to award injunctive relief and compel the President to perform discretionary duties").

### A.      Federal courts lack jurisdiction to subject the President to injunctive or declaratory relief.

Severino's complaint asks this Court to issue a "permanent injunction[] that . . . restores [Mr. Severino's and his colleagues'] appointments to the Council if the President purports to remove them before this Court has opportunity to act."  *See* Compl. ¶ 32.[5]  But "[w]ith regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief."  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted).  A deep and longstanding pedigree supports this rule.  *See Franklin v. Massachusetts*, 505 U.S. 788, 802-803 (1992) ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (quoting *Mississippi v. Johnson*, 71 U.S. (4

---

[5] If Severino purports to bring a claim on behalf of other recently dismissed members of the Council, he lacks standing to do so.  "Third-party standing is available to plaintiffs who, in addition to their own Article III standing, can successfully demonstrate a 'close relationship' with the third parties whose rights they assert and some 'hindrance' to the third parties pursuing their own rights."  *Turner v. U.S. Agency for Glob. Media*, No. CV 20-2885 (BAH), 2020 WL 6822780, at *15 (D.D.C. Nov. 20, 2020) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)); *accord Singleton v. Wulff*, 428 U.S. 106, 114 (1976) ("Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party.")).  The complaint makes no effort to show a "close relationship" between Severino and any other recently dismissed Council members, or to show that these former members—who to date have chosen not to sue—are "hindered" in pursing their own claims.  *See Kowalski*, 543 U.S. at 131-132 (plaintiff failed to establish third-party standing where he could not show necessary "close relationship" between plaintiff and third-party or a hindrance to third party raising its own challenge).

Wall.) 475, 501 (1866)); *Swan v. Clinton*, 100 F.3d 973, 976 n.1, 978 (D.C. Cir. 1996) (holding courts lack the authority to enjoin the President in the performance of his official duties and that "similar considerations" restrict a court's power to issue a declaratory judgment against the President); *Newdow v. Bush*, 355 F. Supp. 2d 265, 280 (D.D.C. 2005) ("There is a longstanding legal authority that the judiciary lacks the power to issue an injunction or declaratory judgment against the co-equal branches of the government—the President and the Congress." (collecting cases)).  As Justice Scalia explained, concurring in *Franklin*, an "apparently unbroken historical tradition supports the view, . . . implicit in the separation of powers established by the Constitution, that the principals in whom the executive and legislative powers are ultimately vested—*viz.*, the President and the Congress (as opposed to their agents)—may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary."  505 U.S. at 827.  "For similar reasons," Justice Scalia concluded courts "cannot issue a declaratory judgment against the President."  *Id.*

The reasons for this rule are "painfully obvious."  *Swan*, 100 F.3d at 978.  The President and the judiciary are co-equal branches of government, and the latter ordering the former to perform specific executive acts "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers."  *Id.* (citing *Franklin*, 505 U.S. at 827 (Scalia, J., concurring)); *accord Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838) ("The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power.").  The Supreme Court considered the "possible consequences" of the judiciary enjoining the President in *Mississippi*, cautioning that it could potentially create a conflict between the President obeying the Court's injunction and executing an act of Congress.  *See* 71 U.S. at 500-501.  And the Court further warned of its lack of "power to enforce its process" in support of any injunction against the President.  *Id.*  For those reasons, the Court concluded that an "attempt on the part of the judicial department . . . to enforce the performance of [executive and political] duties by the President [is] 'an absurd and excessive extravagance.'"  *Id.* at 499 (quoting Chief Justice Marshall)).

Granting Severino his requested relief would require this Court to commandeer one of the most essential and discretionary Executive functions in the Constitution—the President's power to appoint and remove other Executive Branch officials. *See* U.S. Const., art. II, § 2, cl. 2 (granting the President the power to nominate principal officers of the United States and further granting, *inter alia*, "the President alone" the power to appoint inferior officers under laws made by Congress). "The President occupies a unique position in the constitutional scheme," and Article II "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Nixon v. Fitzgerald*, 457 U.S. 731, 749-750 (1982). Chief among these discretionary and sensitive responsibilities is "management of the Executive Branch—a task for which 'imperative reasons requir[e] an unrestricted power [in the President] to remove the most important of his subordinates in their most important duties.'" *Id.* at 750 (quoting *Myers v. United States*, 272 U.S. 52, 134-135 (1926)); *accord Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020) ("[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." (quoting Madison, 1 Annals of Cong. 463 (1789)); *Marbury v. Madison*, 5 U.S. (Cranch) 137, 167 (1803) ("The power of nominating to the senate, and the power of appointing the person nominated, are political powers, to be exercised by the President according to his own discretion."). By constitutional design, courts lack the authority to "control, direct, or restrain" the President's discretionary exercise of this core executive power. *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also Franklin*, 505 U.S. at 802-803; *Mississippi*, 71 U.S. (4 Wall.) at 501.[6]

---

[6] The Supreme Court's decision in *Franklin* "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Swan*, 100 F.3d at 977. "A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Id.* (citing *Mississippi*, 71 U.S. at 498). But a President's appointment and removal power is a responsibility of the "utmost discretion," *Nixon*, 457 U.S. at 750, and is "to be exercised by the President according to his own discretion" under the Constitution, *Marbury*, 5 U.S. at 167. And even if this case involved a ministerial duty—and it does not—courts still routinely decline to compel the President to perform

Finally, in addition to the constitutional bar on Severino's requested relief against the President, this Court further lacks jurisdiction to grant such relief under the Administrative Procedure Act. Severino "brings his claim under the causes of action established in 5 U.S.C. § 704, 28 U.S.C. § 2201, and *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–91 (1949)." Compl. ¶ 31. Section 704 permits review of "final agency action." 5 U.S.C. § 704. But it is well-established that "the President's actions [are] not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA." *Dalton v. Specter*, 511 U.S. 462, 469 (1994) (citing *Franklin*, 505 U.S. at 796); *see also Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001) ("Because the President is not a federal agency within the meaning of the APA, presidential actions are not subject to review pursuant to the APA." (collecting cases) (citing 5 U.S.C. § 704)), *aff'd,* 306 F.3d 1138 (D.C. Cir. 2002). Similarly, the Declaratory Judgment Act merely creates a remedy and supplies no jurisdiction here because "§ 2201 (declaratory judgment) 'is not an independent source of federal jurisdiction.'" *Lovitky v. Trump*, 918 F.3d 160, 161 (D.C. Cir. 2019) (quoting *Metz v. BAE Sys. Tech. Solutions & Servs., Inc.*, 774 F.3d 18, 25 n.8 (D.C. Cir. 2014)). Severino therefore also fails to plausibly allege any statutory source of jurisdiction against the President.[7]

### B. Injunctive or declarative relief against the President's assistants cannot redress Severino's injury.

The Court similarly lacks jurisdiction to issue injunctive or declaratory relief against Russell or Raghavan because they possess no powers or duties distinct from the President's own authority. Because they have no ability to hire or fire other executive officials independent of the

---

such ministerial duties due to the separation-of-powers problems raised by such relief. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (declining to issue writ of mandamus compelling President to perform ministerial duty); *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 926 (D.C. Cir. 1980) (similar).

[7] *Larson* does not change the matter. That decision held that plaintiffs could obtain "specific relief" against officers in their official capacity, without a waiver of sovereign immunity, when those officers act *ultra vires*. *See Larson*, 337 U.S. at 689. But nothing in *Larson* purported to allow such relief against the President. *See Swan*, 100 F.3d at 981 (exercising jurisdiction over claims against subordinate officials under *Larson*, but declining to do so against the President).

President's own statutory and Article II powers, any injunctive or declaratory relief against them would either be a nullity or tantamount to issuing relief directly against the President. This Court lacks jurisdiction either way.

As Director and Deputy Director of the PPO, respectively, Russell and Raghavan have no independent authority or duties with respect to the ACUS Council. The Act grants the President alone the power the appoint (and thus also to remove) Council members. *See* 5 U.S.C. § 595(b); *see also infra* Section II.A. As the PPO's leadership, Russell and Raghavan have the responsibility to "receive[] recommendations, check[] references, conduct[] thorough background investigations of potential nominees, and, ultimately, make[] a recommendation to the president." Bell, 96 Judicature at 299. But it is "[t]he president [that] then makes a nomination and submits it to the Senate," if such confirmation is necessary for the office, and otherwise directly appoints individuals to offices that do not require Senate confirmation. *Id.*; *see also* Patterson, 2001 Pres. Stud. Q. at 420 (explaining "the OPP has responsibility for *recommending* nominations" (emphasis added)). They can therefore advise the President about appointments to the ACUS Council, or (as here) convey the President's orders to members of the Council, but the duty to act is the President's alone. *See Marbury*, 5 U.S. at 165-166 (explaining that the President "is authorized to appoint certain officers, who act by his authority and in conformity with his orders" to "aid him in the performance of these duties," and that when "act[ing] by his authority and in conformity with his orders . . . their acts are his acts").

Further still, as Assistant and Deputy Assistant to the President, Russell and Raghavan serve in roles that are structurally advisory to the President. Their positions are located within the White House Office, comprised of "[c]ore presidential advisors and assistants," within the larger Executive Office of the President. Douglas S. Onley, *Treading on Sacred Ground: Congress's Power to Subject White House Advisers to Senate Confirmation*, 37 Wm. & Mary L. Rev. 1183, 1187 n.24 & 1212 (1996) (further observing that assistants' positions within the White House Office are not statutorily created and that assistants serve at the pleasure of the President); *see also* Cynthia R. Farina, *False Comfort and Impossible Promises: Uncertainty, Information Overload,*

*and the Unitary Executive*, 12 U. Pa. J. Const. L. 357, 406 (2010) (describing White House Office as "the core of the current presidential support structure"); Plum Book at 2-3 (placing the White House Office within the Executive Office of the President).  While Congress allocates funding for these positions, it recognizes the President's plenary authority to appoint "employees in the White House Office without regard to any other provision of law" and instructs only that advisors "shall perform such official duties as the President may prescribe."  3 U.S.C. § 105(a).  Russell and Raghavan therefore serve at the President's pleasure with no Congressional check on their appointment, tenure, or duties.  Russell and Raghavan are "White House staff, which solely advise[] and assist[] the President" and are not "like an agency to which substantial independent authority has been delegated."  *Armstrong v. EOP*, 90 F.3d 553, 558, 565 (D.C. Cir. 1996) (further concluding National Security Council has no "substantive role apart from that of the President, as opposed to a coordinating role on behalf of the President"); *cf. CREW v. Off. of Admin.*, 566 F.3d 219, 224 (D.C. Cir. 2009) (finding EOP component not to be an "agency" under FOIA because it wielded no authority independent from the President and was not "authorized to perform tasks other than operational and administrative support for the President and his staff").[8]

Courts decline to issue injunctive or declaratory relief against individuals exercising power that is purely an extension of the President's own discretionary authority.  For example, in *Al-Aulaqi v. Obama*, the court observed that the "Supreme Court has repeatedly acknowledged the separation-of-powers concerns posed by any judicial attempt to 'enjoin the President in performance of his official duties.'"  727 F. Supp. 2d 1, 43 (D.D.C. 2010) (quoting *Franklin*, 505

---

[8] For this reason, the APA's § 704 also supplies no jurisdiction over Severino's claims against Russell or Raghavan.  The APA defines an "agency" as "each authority of the Government of the United States."  5 U.S.C. § 551(1).  But, as assistants to the President, Russell and Raghavan possesses no independent "authority" of the United States and therefore neither they nor the PPO are an "agency."  *See Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971) (suggesting that a component of the Executive Office of the President whose "sole function [is] to advise and assist the President" would not be an 'agency' under the APA); *cf. Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 905 (D.C. Cir. 1993) (expressing "doubt that Congress intended to include the White House or the Executive Office of the President" within the scope of the term 'agency' under FACA).

U.S. 802-803; citing *Mississippi*, 71 U.S. (4 Wall.) at 501; *Mellon*, 262 U.S. at 488). The court further noted that while it would be an "extraordinary measure" to enjoin the President, "so, too, would it be extraordinary for this Court to order declaratory and injunctive relief against the President's top military and intelligence advisors, with respect to military action abroad that the President himself is alleged to have authorized." *Id.* Similarly, in *Mississippi*, the Supreme Court denied a request to enjoin not only President Johnson from executing and carrying out the post-Civil War Reconstruction Acts, but the military commander assigned to Mississippi as well. *See* 71 U.S. at 475 (describing bill to enjoin). The Supreme Court noted the Reconstruction Acts imposed duties on the military commander that "must necessarily be performed under the supervision of the President as commander-in-chief." *Id.* at 499 (finding such powers "purely executive and political").

Courts apply this reasoning beyond the military context, as well. In *Newdow v. Roberts*, the plaintiff sought injunctive and declaratory relief barring religious prayers or invocations during presidential inauguration ceremonies. *See* 603 F.3d at 1006. He sued, among others, Chief Justice Roberts, the Presidential Inauguration Committee commissioned by then President-elect Obama, as well as several ministers invited by the President-elect to deliver religious invocations. *Id.* The court explained that injunctive and declaratory relief against these defendants would not redress the plaintiff's alleged injury because they "possess[ed] no authority—statutory or otherwise—to actually decide whether future inaugural ceremonies will contain the offending religious elements." *Id.* at 1011. Rather, the details of a presidential inauguration are "subject to the President's or President-elect's discretion" and the court lacked the power to sit in judgment of "a decision committed to the executive discretion of the President or the personal discretion of the President-elect." *Id.* at 1011-1012.

The same reasoning applies here. Russell and Raghavan "possess[] no authority—statutory or otherwise," *Newdow*, 603 F.3d at 1011, to appoint or remove ACUS Council members save when acting at the command of the President. They have no statutory or constitutional duties *at all* apart from serving the President, and their authority is synchronous with the President's own

executive discretion.  The facts of this case illustrate the point.  Raghavan's email to Severino indicated he was "writing on behalf of President Biden," Compl., Ex. B, and nowhere suggested that Raghavan, personally, was requesting that Severino resign.  Relatedly, the Act assigns the President alone the power to appoint ACUS Council members, without Senate approval.  *See* 5 U.S.C. § 595(b).  And as explained *infra* in Section II.A, incidental to his appointing power under the statute, the President also possesses the power to remove Council members.  Enjoining or issuing declaratory relief against Russell or Raghavan would therefore either fail to supply a remedy to Severino or, alternatively, require effectively enjoining the President himself.

Severino's complaint itself acknowledges that Russell and Raghavan acted on behalf of the President.  In addition to alleging that the request to resign was sent "on behalf of President Biden," Compl. at Intro., ¶ 23, the complaint further recognizes that the decision to terminate Severino was, ultimately, the President's decision alone.  For example, the complaint characterizes the request to resign as "President Biden's request," *id.* ¶ 26, and further alleges that "President Biden has no statutory authority to terminate Mr. Severino's appointment to the Council," *id.* ¶ 28, "President Biden has no constitutional authority under Article II to terminate Mr. Severino's appointment," *id.* ¶ 29, and that "President Biden's threatened termination of Mr. Severino and his fellow members is . . . unlawful," *id.* ¶ 30.  The complaint does not allege that Russell or Raghavan terminated Severino, or that they have any independent constitutional or statutory duty regarding his appointment or termination.

Indeed, Severino's complaint fails to describe how injunctive or declaratory relief against Russell or Raghavan even could redress his alleged injury now that he has been removed from the Council.  *See Newdow*, 603 F.3d at 1011 (finding lack of redressability where the requested "declaratory and injunctive relief against the defendants actually named would not prevent the claimed injury").  For example, the Court cannot presently enjoin Russell or Raghavan from removing Severino, because he has already been removed.  *See* Dodge Decl., Exs. C, D; *accord Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 14 (D.C. Cir. 2020) (finding claims moot and non-redressable where injunctive relief could not remedy past harm).  And the

Court cannot issue an injunction compelling these Defendants to reappoint Severino because that decision is assigned by statute to the President alone. *See* 5 U.S.C. § 595(b); *accord Humane Soc'y of the United States v. Babbitt*, 46 F.3d 93, 100-101 (D.C. Cir. 1995) (holding requested injunctive relief did not redress injury where there was "no possibility" that the already completed action could be undone). Because Severino's complaint fails to plausibly allege what injunctive or declaratory relief against Russell or Raghavan could redress his alleged injury, he has failed to show standing to sue them. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("Having found that none of the relief sought by respondent would likely remedy its alleged injury in fact, we must conclude that respondent lacks standing to maintain this suit.").

To be sure, courts have recognized that a challenge to Presidential action can sometimes be sustained where the alleged "injury can be redressed by injunctive relief against subordinate officials." *Swan*, 100 F.3d at 979; *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996) (acknowledging "a reluctance to bring judicial power to bear directly on the President" but noting that the case was instead "concerned with the long established non-statutory review of a claim directed at a subordinate executive official"). But this is not such a case, as *Swan* itself illustrates. There, President Clinton removed Swan from his position as a holdover member of the Board of the National Credit Union Administration ("NCUA"). *See Swan*, 100 F.3d at 974. Swan sued President Clinton, Assistant to the President Robert Nash, and Executive Director of NCUA Karl Hoyle, "seeking to have his removal . . . declared unlawful and to obtain injunctive relief ordering his reinstatement as a member of the NCUA Board." *Id.* at 975. After lengthy discussion of precedent, the Court declined to issue injunctive or declaratory relief against President Clinton, *id.* at 975-979, and then turned to the question of whether Swan could obtain redress through injunctive relief against "subordinate officials." The court first concluded no such relief as to Nash could redress Swan's claimed injury. It explained that "[t]here is little that Nash could do that would achieve the ends Swan seeks, since Nash, as Assistant to the President, has no authority to control NCUA operations." *Id.* at 979. The court found that Hoyle, as Executive Director of the NCUA, was "another story" because he possessed independent responsibilities "for

coordinating the activities of the senior executive staff of the NCUA, and thus could direct the staff to treat Swan as a Board member." *Id.* (citing 12 C.F.R. § 790.2 (1996)).

Russell and Raghavan, like Nash, are "Assistant[s] to the President" with "no authority to control" ACUS operations. *Swan*, 100 F.3d at 979.[9]  And unlike in *Swan*, Severino has failed to name any defendant besides the President with independent duties related to ACUS.[10]  Courts enjoining "subordinate officials" in lieu of the President are typically able to point to such independent duties to distinguish the subordinate official's responsibilities from the President's. For example, in *Franklin*, the plaintiffs sued both the President and the Secretary of Commerce over the apportionment of seats in the House of Representatives after the decennial census. *See* 505 U.S. at 790-791.  By statute, the Secretary has independent obligations to conduct the census "in such form and content as [s]he may determine," and to then prepare a report for the President showing the tabulation of total population by states, as necessary for apportionment of Representatives. *Id.* at 792 (citing 13 U.S.C. § 141).  The plurality in *Franklin* declined to "decide whether injunctive relief against the President was appropriate, because [it] conclude[d] that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone." *Id.* at

---

[9] Nash, like both Russell and Raghavan, was also a leader within the PPO. *See* Appellee Br. at 1 n.1, *Swan v. Clinton*, Case No. 96-5193 (D.C. Cir. Aug. 13, 1996) (identifying Nash as Director of PPO).

[10] Severino's complaint notably does not name ACUS itself, or any of its officers or Council members, as defendants.  Even if injunctive or declaratory relief against such entities or individuals could theoretically redress part of Severino's alleged injury, the Court should not relieve Severino of his pleading obligations, which "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Ctr. for Democracy & Tech. v. Trump*, No. 1:20-CV-01456 (TNM), 2020 WL 7318008, at *9 (D.D.C. Dec. 11, 2020) (acknowledging hypothetical possibility that relief could be granted against subordinate official but dismissing case based on how plaintiff "presented its case to the Court").  The Court also should not enjoin a non-party over which it has not yet established jurisdiction, particularly where the complaint fails to allege any coordination or privity as to that non-party. *See* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2956 (3d ed.)  ("A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction.  Therefore, persons who are not actual parties to the action or in privity with any parties may not be brought within the effect of a decree merely by naming them in the order.").

803.  The Court observed that, in view of her statutory duties, the Secretary "certainly has an interest in defending her policy determinations concerning the census" and "has an interest in litigating its accuracy." *Id.*  Similarly, in *Reich*, the plaintiffs challenged an Executive Order issued by President Clinton restricting federal contracts for companies that hired strikebreakers. *See* 74 F.3d at 1324.  The order charged the Secretary of Labor "with implementing and enforcing the order" *id.*, and further granted the Secretary significant discretion over implementation. *Id.* at 1338.  In view of these distinct duties, the court possessed the power to "review . . . a claim directed at a subordinate executive official." *Id.* at 1331 n.4.

But here, "there are no other officials—subordinate or otherwise—to whom the Court could issue an order that would redress the constitutional violation alleged by [Severino] in this case." *Newdow*, 355 F. Supp. 2d at 282 (dismissing case against the President and others for lack of redressability).  Severino's challenge here is, in essence, a "cause of action [] against the President" and a "remedy directed toward any subordinate officials would not redress [his] injury." *Barnett v. Obama*, No. SACV09-0082 DOC(ANX), 2009 WL 3861788, at *12 (C.D. Cal. Oct. 29, 2009) (dismissing case for lack of redressability), *aff'd sub nom. Drake v. Obama*, 664 F.3d 774 (9th Cir. 2011); *accord Newdow*, 603 F.3d at 1013 (finding no redressability where the "only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against . . . the President himself").[11]  Because this Court lacks the authority to issue the only relief that can redress Severino's claimed injury—injunctive or declaratory relief against the President—the case must be dismissed for lack of jurisdiction.[12]

---

[11] The case should be dismissed in its entirety for this reason.  But at minimum "the President should be dismissed" as a party "[g]iven that the Court [can] not grant Plaintiff[] the relief that [he] seek[s] against the President himself." *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. 2018) (dismissing President from the case after determining that the Court would not grant any requested injunctive relief against him).

[12] Including the United States as a party does not remedy the jurisdictional flaws in the complaint.  The Administrative Procedure Act permits challengers to seek a judgment or decree against the United States "*[p]rovided* . . . [t]hat any mandatory or injunctive decree shall specify the Federal officer or officers . . . personally responsible for compliance." 5 U.S.C. § 702.  Because Severino

## II.     The President May Remove ACUS Council Members At His Discretion

Even if the Court could grant him relief, Severino's complaint nonetheless lacks merit because the President may remove ACUS Council members at his discretion.  Severino challenges the President's statutory authority to remove him because the Act contains no express grant of removal power to the President (or anyone else).  But longstanding rules of statutory interpretation hold that an appointing power in a statute—the President, here—is presumed to have the incidental authority to remove officers he otherwise appoints.  Overcoming this presumption requires clear and definitive language from Congress limiting the appointing power's removal authority.  No such language exists in the Act.  Severino therefore clings to the fact that the statute prescribes a three-year term of service.  But under a similarly longstanding statutory canon, terms of service operate only as limitations on a period in office, rather than as a guarantee to the full term.  The Administrative Conference Act thus permits the President, as the power who appoints Council members, to remove them at his discretion.

No constitutional or statutory reason exists to read a limitation on this power into the statute here.  Congress chose to give the President alone the power to choose Council members, without need for the Senate's assent.  And ACUS's history, structure, and duties all distinguish it from the sort of independent agency that Congress sometimes chooses to provide with express removal protections.  This is accordingly not one of the rare instances where a court might infer removal protections that Congress chose not to make explicit.  To the contrary, inferring such removal protections here would present significant constitutional concerns in view of the President's Article II power to remove Executive Branch officials.  The canon of constitutional avoidance therefore supplies an additional reason to apply the statute's plain meaning and decline any invitation from Severino to imply protections on constitutional grounds.

---

lacks standing to obtain, and this Court lacks jurisdiction to grant, such a decree against the relevant officials, the inclusion of the United States as a party is immaterial.

A.     **The President may remove ACUS Council members under the Administrative Conference Act.**

The Administrative Conference Act grants the President, without need for Senate approval, the power to appoint ACUS Council members, who in turn enjoy no explicit statutory removal protections.  Under well-established principles for construing appointment statutes, the President retains the right to remove officers subject to his appointment power barring clear Congressional intent to the contrary.  The Supreme Court has long held "as a matter of statutory interpretation, that, absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'"  *Carlucci v. Doe*, 488 U.S. 93, 95 (1988) (quoting *Keim v. United States*, 177 U.S. 290, 293-294 (1900)) (collecting cases); *see also Shurtleff v. United States*, 189 U.S. 311, 316 (1903) (explaining the right of removal "does not exist by virtue of the grant, but . . . . inheres in the right to appoint, unless limited by constitution or statute"); *Keim*, 177 U.S. at 293-294 (holding that absent a "specific provision to the contrary" the Secretary of the Interior retained the incidental power to remove clerks he previously appointed).  This rule traces its origins to *In re Hennen*, which held that a law granting district courts the power to appoint their own clerks necessarily gave the courts removal power as well.  *See* 38 U.S. (13 Pet.) 230, 259 (1839).  The Court explained that in "the absence of all constitutional provision, or statutory regulation" it was a "sound and necessary rule, to consider the power of removal as incident to the power of appointment."  *Id.*  Thus, the clerks "h[e]ld their office at the will and discretion of the head of the department," *id.* at 260, namely the district courts that appointed them.  The Court considered this "the settled usage and practical construction of the Constitution and laws."  *Id.*

The Act provides that Council members are "appointed by the President," 5 U.S.C. § 595(b), and members therefore "hold their office at the discretion of the appointing power," which here is the President alone.  *In re Hennen*, 38 U.S. (13 Pet.) at 260 (recognizing "the Constitution has authorized Congress, in certain cases, to vest this power in the President alone").  The act contains no statutory protections from removal, nor does it guarantee members their full term of years, stating only that the "term of each member . . . is 3 years."  5 U.S.C. § 595(b).  In

the "absence" of "statutory regulation" over removal, the Court here need do nothing more than apply the "sound and necessary rule" of construction that, for Council members, "the power of removal [i]s incident to the power of appointment." *In re Hennen*, 38 U.S. (13 Pet.) at 259; *accord Myers*, 272 U.S. at 119 ("[The] constitutional principle [that] the power of appointment carried with it the power of removal . . . has been recognized ever since" the Constitutional Convention, as "as a rule of [both] constitutional and statutory construction.").

Severino alleges that he is entitled to serve the full default three-year term prescribed in ACUS's governing statute because the Act "makes no provision or allowance for at-will Presidential removal." Compl. ¶ 22. But Severino's claim rests upon at least two flawed assumptions: *first*, that appointment for a term of years is a grant to serve the full term; and, *second*, that the appointing power's removal authority must be expressly stated in the statute. *See id.* ¶¶ 28-31. Both of these assumptions conflict with well-established rules for interpreting appointment statutes.

Contrary to Severino's first assumption, "[i]t is a long-standing rule in the federal courts that a fixed term merely provides a time for the term to end. The fixed term is merely a 'cap' with the appointee removable at will." *Pievsky v. Ridge*, 98 F.3d 730, 734 (3d Cir. 1996) (citing *Parsons v. United States*, 167 U.S. 324 (1897)); *see also Stanley v. Gonzales*, 476 F.3d 653, 660 (9th Cir. 2007) (explaining that "appointment to a position for a fixed term does not in itself require that [the occupant] be allowed to serve the entire term, absent removal for cause" (citing *Parsons*, 167 U.S. at 339); *Stanley v. DOJ*, 423 F.3d 1271, 1274 (Fed. Cir. 2005) (it is "not the law" that a bankruptcy trustee is entitled to serve his full five-year term because "because inferior officers may be removed before the end of their statutorily defined term" (citing *Ridge*, 98 F.3d at 734)). In *Parsons,* the Supreme Court held that the President had the power to remove United States Attorneys before the expiration of their statutorily-prescribed four year terms. *See* 167 U.S. at 330. The Court concluded that a statute providing for a default term of service, without any reference to removal, was "an act of limitation, and not of grant," whose purpose "clearly was not to grant an unconditional term of office for that period." *Id.* at 338-339 (construing the act "as

providing absolutely for the expiration of the term of office at the end of four years, and not as giving a term that shall last at all events for that time . . . .").  It is accordingly "settled that, in the absence of a provision expressly" providing removal protections, "the clause fixing the tenure [of an office] will be construed as a limitation, not as a grant, and that, under such legislation, the President, acting alone, has the power of removal."  *Myers*, 272 U.S. at 241 (Brandeis, J., dissenting) (citing *Parsons*, 167 U.S. 324).[13]

The Administrative Conference Act fixes the default tenure of a Council member but otherwise supplies no words of grant and provides no protection from removal before the completion of a full term.  *See* 5 U.S.C. § 595(b).  Congress therefore chose, under the long-settled rule in *Parsons*, not to guarantee Council members their full terms.  *See also Porter v. Coble*, 246 F. 244, 249 (8th Cir. 1917) (*Parsons* "settled that the President had the power to remove" an officer appointed to a term of years "at any time during his term"); *U.S. ex rel. Frizzell v. Newman*, 42 App. D.C. 78, 100 (D.C. Cir. 1914) (concluding it "is undoubtedly within the power of the President to remove a commissioner of the District [of Columbia] from office" despite otherwise being "appointed for a term of three years" (citing *Parsons*, 167 U.S. 324)).

ACUS's organic statute includes an ordinary holdover provision stating that members "may continue to serve until a successor is appointed."  5 U.S.C. § 595(b).  But nothing in this language indicates Congress intended to guarantee members their full terms.  When Congress desires to provide such a guarantee, it knows how to do so expressly.  *See, e.g.*, *Myers*, 272 U.S.

---

[13] Justice Brandeis separately concluded that the specific statute at issue in *Myers* "used words of grant" because "Congress clearly intended to preclude a removal without the consent of the Senate." 272 U.S. at 241.  That statute, unlike the one here and in *Parsons*, unambiguously granted the officeholder certain removal protections, providing that postmasters could only be removed "with the advice and consent of the Senate, and shall hold their officers for four years unless sooner removed or suspended according to law."  *Id.* at 107 (quoting Act of Congress of July 12, 1876, ch. 179 § 6, 19 Stat. 78, 80-81 (1876)).  The statute here provides no similar removal protections, nor does it command that Council members "shall" hold their office for full terms absent removal "according to law."  *See* 5 U.S.C. § 595(b) (stating only that "[t]he term of each member . . . is 3 years.").  Thus, both the *Myers* majority and Justice Brandeis, in dissent, acknowledged that *Parsons* resolved the issue here.  *See* 272 U.S. at 146.

at 107 (describing tenure protections in 19 Stat. 80-81); *Humphrey's Executor v. United States*, 295 U.S. 602, 623 (1935) (describing the "definite and unambiguous" protections for FTC Commissioners). Moreover, courts apply the rule in *Parsons* even when statutes include holdover provisions permitting officials to serve past their default term. *See, e.g.*, *Stanley*, 423 F.3d at 1274-1275 (officers serving five-year terms with holdover provisions nonetheless "may be removed before the end of their statutorily defined term"); *Ridge*, 98 F.3d at 734 (commissioners serving five-year terms with holdover provisions still "removable at will").

Similarly, in *PHH Corp. v. CFPB*, then-Judge Kavanaugh argued in dissent that the CFPB Director's removal protections were unconstitutional but otherwise severable. *See* 881 F.3d 75, 198-200 (D.C. Cir. 2018) (en banc). In addressing the scope of what he would sever from the statute, Judge Kavanaugh explained that he "would not invalidate and sever the tenure provision," and thus he believed the Director could continue to serve under the "five-year tenure provision for the Director" in the Dodd-Frank Act. *Id.* at 200 n.20 (citing 12 U.S.C. § 5491(c)(1)). The same subsection of the statute also included an ordinary provision permitting holdover service. *See* 12 U.S.C. § 5491(c)(2) (permitting Director to serve after expiration of term "until a successor has been appointed and qualified"). Despite the holdover provision, Judge Kavanaugh concluded the tenure term could be upheld because "under Supreme Court precedent, those kinds of tenure provisions do not prevent the President from removing at will a Director at any time during the Director's tenure." *PHH Corp.*, 881 F.3d at 200 n.20 (citing *Parsons*, 167 U.S. at 343).[14] In other words, the statute's tenure provision did not impinge on the President's constitutional removal authority, even with a holdover provision, because the President retained the right to remove the Director at will before the end of her term. The presence of a typical holdover provision in the Act therefore offers no reason to infer that Congress intended the term of office as a grant or to implicitly restrict the President's ordinary removal power under the statute.

Severino's second critical assumption—that the appointing power under a statute requires

_____

[14] Judge Kavanaugh's dissenting opinion in *PHH Corp.* was later vindicated in *Seila Law*. *See* 1404 S. Ct. at 2207.

an express statutory grant of removal power (Compl. ¶ 28)—is similarly wrong.  The default rule is that "the power of removal from office is incident to the power of appointment," barring "a specific provision to the contrary."  *Keim*, 177 U.S. at 293-294.  No such "specific provision" exists here.  Severino's complaint thus gets it backwards—the ordinary rule is that a provision *barring* removal must be expressly stated, while the power of removal is otherwise presumed to be incidental to the power of appointment.  *Id.*

The Supreme Court has made clear that this "usual rule governing the tenure of office" applies barring "plain and explicit language" from Congress.  *Shurtleff*, 189 U.S. at 316.   In *Shurtleff* a general appraiser of merchandise challenged his removal under a statute that provided for removal "from office at any time for inefficiency, neglect of duty, or malfeasance in office." *Id.* at 314.  The challenger argued that these express for-cause provisions implicitly excluded termination for any other reason, and that his removal therefore violated the statute because he was not removed on any of these grounds.  In determining whether "the officer should only be removed for the causes stated," the Court concluded that "in the absence of constitutional or statutory provision, the President can, by virtue of his general power of appointment, remove an officer, even though appointed by and with the advice and consent of the Senate."  *Id.* at 314-315.  In view of that presumption, the Court held that to "take away this power of removal in relation to an inferior office created by statute . . . would require *very clear and explicit language*."  *Id.* at 315 (emphasis added).  This power, as a matter of statutory construction, "should not be held to be taken away by mere inference or implication."  *Id.*[15]  Thus, to the extent the President's removal power even could "have been taken away by an act of Congress,"—particularly where, as here, Congress granted the President alone the power of appointment—"court[s] . . . require explicit

---

[15] *Parsons* and *Shurtleff*, "despite their constitutional undertones, were decided as cases of statutory interpretation."  Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163, 1172 (2013).  Both decisions concerned whether the statutes at issue overcame the "interpretive default rule . . . in favor of at-will tenure," *id.* at 1169, and found that they did not in either case.  The issue here is likewise first and foremost statutory—whether the Act protects Council members from removal before the expiration of their default terms.  As in *Parsons* and *Shurtleff*, nothing in the statute overcomes the usual interpretive rules.

language to that effect." *Id.*; *see also Morgan v. Tenn. Valley Auth.*, 115 F.2d 990, 992 (6th Cir. 1940) (explaining in removal context that "curtailment by the Congress of an inherent power of the President, assuming its constitutional validity, is not to be implied without clear indication of the legislative purpose"); *cf. Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (explaining the general rule that when "Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear").

The Act contains no such "plain and explicit language" limiting the President's power to remove Council members. *Shurtleff*, 189 U.S. at 316. Given the lack of explicit protection, and in view of the President's presumptive right (as the appointing power) to remove a Council member before the completion of his term, President Biden possessed authority under the Act to remove Severino.[16]

## B.     Severino offers no reason to read removal protections into ACUS's governing statute.

Because the Administrative Conference Act supplies no explicit removal protections, Severino's complaint suggests that such protections should be implied in the Act as a constitutional matter. *See* Compl. ¶¶ 28-29. But Severino offers no reason to depart from the ordinary rules for construing statutes that govern appointments, *id.*, and Congress gave no indication here that it desired to insulate Council members from the President's presumptive removal authority. *See supra* Section II.A. To the contrary, Congress permitted the President to choose Council members

---

[16] Based on these longstanding principles, the Executive Branch has long concluded that the President may remove Senate-confirmed officers before the expiration of their terms where the appointing statute provides no express removal protections. *See, e.g.*, C*onstitutionality of Legis. Extending the Term of the F.B.I. Director*, 2011 WL 2566125, at *3 (O.L.C. June 20, 2011); *Removability of the Fed. Coordinator for Alaska Nat. Gas Transp. Projects*, 2009 WL 4325376, at *2 (O.L.C. Oct. 23, 2009); *Holdover & Removal of Members of Amtrak's Reform Bd.*, 27 Op. O.L.C. 163, 166-167 (2003); *Removal of Holdover Offs. Serving on the Fed. Hous. Bd. & the R.R. Ret. Bd.*, 21 Op. O.L.C. 135, 136-137 (1997); *Const. Separation of Powers Between the President & Cong.*, 20 Op. O.L.C. 124, 166-170 (1996); *accord Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 53 (2015) (noting that Amtrak board members appointed to a five-year term were nonetheless "understood by the Executive to be removable by the President at will"). And unlike the officers at issue in these opinions, Severino's part time position did not require Senate confirmation. *See* 5 U.S.C. § 595(b).

at his own discretion, consistent with the practice of the temporary Conference established by President Kennedy, shortly before passage of the Act.  The Court should therefore decline any invitation to transform a simple case of statutory interpretation into a constitutional confrontation between the branches of government.  *See Franklin*, 505 U.S. at 828 (explaining the constitutional bar on injunctive relief against the Presidents exists to avoid such "needless head-on confrontations between district judges and the Chief Executive") (Scalia, J., concurring); *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389-390 (2004) (explaining that "occasion[s] for constitutional confrontation between" the Judiciary and Executive "should be avoided whenever possible" (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)); *see also infra* Section II.C (discussing the constitutional avoidance canon).

To be sure, courts have, in specific contexts, addressed the constitutionality of *explicit* for-cause removal protections for certain Senate-confirmed officers appointed by the President, *see, e.g.*, *Humphrey's Executor*, 295 U.S. 602, and in even more limited circumstances inferred such protections, *see Wiener v. United States*, 357 U.S. 349 (1958); *cf. Free Enter. Fund v. Pub. Co. Acct. Bd.*, 561 U.S. 477, 487 (2010).  But this case presents nothing so remarkable.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (recognizing Congress does not usually "hide elephants in mouseholes").  No court has ever found implicit removal protections for the kind of office here—an uncompensated, part-time role filled at the President's sole discretion, without explicit statutory removal protections, serving on the board of a purely advisory executive agency.  The Act and the history of ACUS provide no "affirmative evidence" of a Congressional desire to restrict removal of Council members, and Severino cites no such evidence in his complaint.  *See Swan*, 100 F.3d at 981 (explaining courts "can only find such a restriction" on removal authority where "affirmative evidence" exists (citing *Armstrong*, 924 F.2d at 289)).  The D.C. Circuit, in *Swan*, has already declined to infer removal protections in circumstances presenting far more compelling evidence of Congressional intent.  *Id.* at 982 (declining to infer removal protections while noting amendments to the agency's organic statute "garner[ed] support for inferring some removal protection"); *see also id.* at 990 ("We have never held . . . that an appointee to a multi-

member regulatory agency with a term appointment enjoys tenure equivalent to the term appointee who, according to the explicit terms of the statute, may not be removed except for good cause.") (Silberman, J., concurring).

Rather than explain why ordinary statutory rules should not govern this case, Severino's complaint instead cites, without meaningful discussion, *Humphrey's Executor* and *Wiener*. *See* Compl. ¶¶ 28-29. But those cases are far afield from the facts here. In *Humphrey's Executor*, the Supreme Court upheld "definite and unambiguous" statutory removal protections limiting the President's ability to dismiss a Commissioner on the Federal Trade Commission to cases of "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 623. Congress tasked the Commission with significant powers, including to issue complaints against businesses allegedly violating the competition laws and to enjoin such practices after a hearing. *Id.* at 620-621. The Court characterized these powers as "neither political nor executive, but predominantly quasi judicial and quasi legislative," *id.* at 624,[17] requiring that the Commission "be free from executive control," *id.* at 628. In view of these powers, Congress intended the Commission "to be nonpartisan," limiting the number of Commissioners who could be members of the same political party and requiring appointment "with the advice and consent of the Senate." *Id.* at 620, 624 (noting that the Commission's duties require that it "act with entire impartiality"). Congress further provided for staggered, fixed term appointments to ensure "that the membership [of the Commission] would not be subject to complete change at any one time." *Id.* at 624.[18] Bearing in

---

[17] The Supreme Court has since suggested that these characterizations have "not withstood the test of time." *Seila Law*, 140 S. Ct. at 2198 n.2 (citing *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988)); *see also Arlington v. FCC*, 569 U.S. 290, 304, n.4 (2013). Regardless of characterization, the Commission's structure and responsibilities are dramatically different from the purely advisory role played by ACUS. *See infra* at 30-35.

[18] To that end, the statute provided that the "first commissioners appointed *shall* continue in office for terms of three, four, five, six, and seven years" and that their successors "*shall* be appointed for terms of seven years." *Humphrey's Executor*, 295 U.S. at 620 (quoting 15 U.S.C. § 41 (emphases added)). Accordingly, in addition to the statute's express removal protections, the act used clear words of grant to ensure Commissioners would serve complete, staggered terms. No similar words of grant, or staggered terms, exist here.

mind this specific "character of [] office," *id.* at 631, the Court concluded that the Constitution did not vest the President with "illimitable power of removal . . . in respect of officers of the character of those just named," and thus upheld Congress's express statutory protections. *Id.* at 629.

The Court applied the reasoning of *Humphrey's Executor* again in *Wiener*, which concerned a suit for back pay by a member of the War Claims Commission ("WCC") who had been dismissed and replaced by President Eisenhower with a recess appointee. *See* 357 U.S. at 349-350. Congress created the WCC to adjudicate claims compensating internees, prisoners of war, and religious organizations who suffered property damage during World War II, subject to no further judicial review. *See id.* Commissioners were appointed "by and with the advice and consent of the Senate" and the Commission was statutorily designed to expire within three years. *Id.* at 350. Although "nothing was said in the act about removal," the Court found strong affirmative evidence that Congress intended for Commissioners to be protected from removal. *Id.* at 350, 352-354. Specifically, the "Commission was established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof." *Id.* at 354. This reflected the "intrinsic judicial character of the task with which the Commission was charged," *id.* at 355, requiring that the body be "'entirely free from the control or coercive influence, direct or indirect' of either the Executive or the Congress." *Id.* at 355-356 (quoting *Humphrey's Executor*, 295 U.S. at 629); *see also Morrison*, 487 U.S. at 688 ("As in *Humphrey's Executor,* however, the Commissioners [in *Wiener*] were entrusted by Congress with adjudicatory powers that were to be exercised free from executive control."). Thus, despite Congress's silence,[19] "[t]he philosophy of *Humphrey's Executor*" precluded a claim that the President held either constitutional or statutory

---

[19] *Wiener* is the only case to date in which the Supreme Court has inferred that Congress intended to limit the President's authority to remove officers. Subsequent decisions have speculated that "the statute made no provision for the removal of officers, perhaps because the Commission itself was to have a limited existence." *Morrison*, 487 U.S. at 688. Indeed, at the time Wiener sued, the WCC had ceased to operate. *See Wiener*, 357 U.S. at 350-351. Regardless of the precise reason, the ordinary rule remains that when "Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear." *Armstrong*, 924 F.2d at 289.

power to remove the Commissioners from their adjudicatory role.  *Wiener*, 357 U.S. at 356.[20]

Members of the ACUS Council do not share the same "character of [] office," *Humphrey's Executor*, 295 U.S. at 631, as the commissioners in the cases above for numerous reasons.  As an initial matter, Congress passed statutes in those cases that required that the respective commissioners be appointed "by and with the advice and consent of the Senate."  *Id.* at 620 (quoting 15 U.S.C. § 41); *Wiener*, 357 U.S. at 350 (quoting War Claims Act of 1948, 62 Stat. 1240 (1948)).  That limitation on the President's appointment authority reflected the significant duties that those commissioners were expected to carry out free of executive interference.  *See Humphrey's Executor*, 295 U.S. at 628 (explaining Congress intended the FTC be "free from executive control"); *Wiener*, 357 U.S. at 355-356 (explaining the "judicial character" of the WCC required it be free of executive control); *see also Seila Law*, 140 S. Ct. at 2192 (explaining *Humphrey's Executor* held Congress could limit the President's power to remove commissioners of independent agencies "led by a group of principal officers," who thus require Senate confirmation).  By contrast, in the Act, Congress elected to make only the Chairman position subject to Senate confirmation, with the other ten Council members chosen at the President's discretion.  *See* 5 U.S.C. § 595(b).  It is not plausible that Congress silently intended for ACUS to operate with the same high degree of independence from the President as the FTC and WCC, but nonetheless chose to give the President near-total discretion over the composition of its governing board.  *See* Antonin Scalia & Stephen G. Breyer, *Reflections on the Administrative Conference*, 83 Geo. Wash. L. Rev. 1205, 1207 (2015) (analogizing the role of the Council as similar to a

---

[20] In *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993), the appellants argued that the Federal Election Commission Act's "silen[ce] as to the President's removal authority" over Commissioners implied "that he ha[d] none," much as Severino claims here with respect to Council members.  *See* Compl. ¶ 28.  The D.C. Circuit cast doubt on that argument, noting that "statutory silence could imply that the President actually enjoys an unrestricted power of removal." *NRA Pol. Victory Fund*, 6 F.3d at 826 (citing *Shurtleff*, 189 U.S. at 316).  But the Court ultimately made no firm holding on the issue because it "assume[d] that the President would at minimum have authority to discharge a[n] [FEC] commissioner for good cause—if for no other." *Id.*; *see also SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir. 1988) (accepting for purposes of argument the challengers' assertion that SEC commissioners can only be removed for cause).

"corporate board of directors" (Testimony of Scalia, J.)).

ACUS's duties further prove the point.  The powers of the ACUS Council concern the internal administration of ACUS itself.  5 U.S.C. § 595(b)(1)-(7).  And the powers of the Assembly (of which Council members are a part) are limited to making recommendations to other executive agencies and federal offices to improve administrative procedure.  *See generally id.* § 595. Severino admits in his complaint that ACUS "does not wield any power at all as a purely advisory entity."  Compl. ¶ 29; *see also id.* ¶ 9 (further admitting ACUS "does not exercise 'quasi-legislative' or 'quasi-judicial' powers," as described in *Humphrey's Executor*).  Such a purely advisory function does not "require" ACUS to act "independently of executive control" in the "discharge of [its] duties."  *Humphrey's Executor*, 295 U.S. at 629; *see also Wiener*, 357 U.S. at 353 (describing the Commission's need for "absolute freedom from Executive interference"). Whereas the FTC can impose cease and desist orders on businesses, *see Humphrey's Executor*, 295 U.S. at 620, and the WCC could adjudicate war claims subject to no judicial review, *see Wiener*, 357 U.S. at 354-355, ACUS "ha[s] no power whatever to enforce its own recommendations," H.R. Rep. No. 88-1565, at 4, and merely provides "machinery through which to formulate, not to impose, recommendations designed to improve administrative procedure," *id.* at 3 (further explaining ACUS findings were not to be "attribute[d] the weight of law"); *see also* S. Rep. No. 88-621, at 2 (1963) (noting "the Conference's powers will be strictly limited to recommendations").[21]  Congress recognized that the significant enforcement powers of the FTC and adjudicatory powers of the WCC required a degree of independence from the rest of the Executive Branch, but ACUS, by contrast, in fact *depends* upon the rest of the Executive Branch to adopt and implement its recommendations.  *See* Scalia & Breyer, 83 Geo. Wash. L. Rev. at 1207

---

[21] Indeed, ACUS's responsibilities are so circumscribed to an "advisory function," that (at least its nongovernmental members) are not subject to the Emoluments Clause because they do not hold an office of profit or trust.  *See Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 34 Op. O.L.C. 181, 186 (O.L.C. June 3, 2010) ("In light of ACUS's purely advisory function as well as its governance structure, we do not believe its nongovernmental members exercise the type of supervisory power or decisional authority that could potentially be relevant to a conclusion that they are subject to the Emoluments Clause.").

("The Conference, after all, has no enforcement powers over other agencies—let alone over the President and Congress, whose action is often needed to turn recommendations into reality." (Testimony of Scalia, J.)).  ACUS's duty therefore is, *inter alia*, to serve and advise the Executive Branch, not to operate apart from it, and thus "the nature of the function that Congress vested" in ACUS provides no basis "for drawing an inference regarding the President's power of removal." *Wiener*, 357 U.S. at 353.

ACUS's history further reflects the President's traditional discretion over the composition of the Council.  The agency's origin rests in two temporary conferences convened by President Eisenhower and President Kennedy by executive order.  *See* H.R. Rep. No. 88-1565, at 21, 25-27. ACUS was ultimately modeled substantially on the conference convened by President Kennedy. *See id.* at 2-3; *see also Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 34 Op. O.L.C. at 183 ("Congress established a structure much like the one that President Kennedy had established.").  That conference was led by "a Council of eleven members named by the President" at his discretion, H.R. Rep. No. 88-1565, at 28 (quoting Executive Order No. 10,934), an approach the Administrative Conference Act maintained save as to the Chairman. Nothing in the history of the Conference, or the Administrative Conference Act, reflects a Congressional desire to insulate Council members from the President's removal power.  *Cf. Humphrey's Executor*, 295 U.S. at 624 (discussing how legislative history reflected agency's need for independence from the Executive Branch); *see also Wiener*, 357 U.S. at 354-355 (similar).

To the contrary, several amendments concerning the composition of the Council demonstrate that Congress intended to grant the President broad discretion over its membership. The original bill required that the Council be composed "preponderantly of Federal officials and personnel."  *See* S. Rep. No. 88-261, at 2.  The Senate committee struck that language, explaining that "the President should have as much flexibility as possible in providing for the most effective group of Council members."  *Id.* at 3.  The Senate's report indicated that it was "likely that Federal officials and personnel will be in the majority on the Council at most times," and the matter "should be left to the discretion of the President at any particular time."  *Id.*  The House offered its own

compromise amendment, which was adopted in the final bill, providing that "not more than one-half of the 10 members of the Council to be appointed by the President shall be Government personnel." H.R. Rep. No. 88-1565, at 3; *see also* 5 U.S.C. § 595(b). As Leon Ulman, the then-Deputy Assistant Attorney in the Office of Legal Counsel, explained in a letter to then-Chairman Scalia in 1972, this formulation left the ratio of public to government members on the Council "primarily within the discretionary power of the President in appointing Council members." Dodge Decl., Ex. H at 7. In sum, the final bill "g[a]ve the President discretion as to the composition of the Council, subject to the limitation that no more than five members be from the government." *Id.* at 8.

Finally, in addition to its duties and history, ACUS's structure further distinguishes it from the agencies in *Humphrey's Executor* and *Wiener*. On top of not requiring Senate confirmation, ACUS Council members are also not paid and serve only part time. *See* 5 U.S.C. §§ 593(c), 595(b). By contrast, FTC Commissioners are paid a salary and are statutorily barred from "engag[ing] in any other business, vocation, or employment" during their terms, in accordance with the nature and significance of their duties. *Humphrey's Executor*, 295 U.S. at 620 (quoting 15 U.S.C. § 41). The members of the WCC similarly drew an annual salary. *See Wiener*, 357 U.S. at 350-351 (citing 62 Stat. 1240, § 2(a)).[22] Severino's status as a part-time volunteer free to pursue other work outside of the government further reflects the dissimilarity of his role from those at issue in *Humphrey's Executor* and *Wiener*.

ACUS is also not "a traditional independent agency headed by a multimember board or

---

[22] *Humphrey's Executor*, *Wiener*, as well as nearly all other Supreme Court decisions in which an official challenged his removal by the President, notably concerned claims for damages rather than injunctive relief. *See, e.g.*, *Parsons*, 167 U.S. at 326 (petition for salary); *Keim*, 177 U.S. at 290 (petition for salary); *Myers*, 272 U.S. at 106 (suit for salary); *Humphrey's Executor*, 295 U.S. at 612 (suit "to recover a sum of money"); *Wiener*, 357 U.S. at 349 ("suit for back pay"). The challengers in these cases did not seek—as Severino does here—to have the federal courts compel the President to reappoint them to their former positions. Unlike those challengers, Severino cannot premise his lawsuit on a claim for damages because his part-time position was uncompensated. *See* 5 U.S.C. §§ 593(c), 595(b). These cases reinforce both the extraordinary relief Severino seeks as well as his lack of standing to obtain it. *See supra* Section I.

commission." *Seila Law*, 140 S. Ct. at 2193, 2198-2200 (characterizing the commissions in *Humphrey's Executor* and *Wiener*). Instead, it is led by the Chairman, who is the "chief executive of the Conference" and also the Council's sole full-time, compensated, and Senate-confirmed member. 5 U.S.C. §§ 593(c), 595(b), 595(c). ACUS's own publication, the *Sourcebook of United States Executive Agencies*, characterizes the agency as "led by a single presidentially appointed individual who serves a fixed term." Jennifer L. Selin & David E. Lewis, *Sourcebook of United States Executive Agencies* 48 (2d ed. 2018) ("*Sourcebook*"). The *Sourcebook* distinguishes ACUS from "the classic independent regulatory commissions," and instead includes it among the "boards outside of the EOP and executive departments that neither regulate nor adjudicate," *id.* at 55, in contrast to both the FTC and WCC, *see Humphrey's Executor*, 295 U.S. at 620 (describing FTC's regulatory powers); *Wiener*, 357 U.S. at 349-350 (describing WCC's adjudicatory powers); *see also Sourcebook* at 48, Table 5 (including ACUS among "Non-Multimember Agencies" led by a Chairman); 44 U.S.C. § 3502(5) (defining "independent regulatory commission" to include a number of independent commissions but not ACUS).[23]

Indeed, the *Sourcebook* notes that ACUS lacks nearly every traditional indication of a so-called "classic independent regulatory commission" and expressly distinguishes it from such entities. *See Sourcebook* at 42, Table 3 (characterizing ACUS as an agency outside of the EOP and Executive Departments but as not an "Independent Commission" or "Board"); *id.* at 48, Table 5 (noting ACUS Chairman lacks for-cause removal protections); *id.* at 97, Table 9 (including ACUS among agencies with holdover provisions but not explicit for-cause protections or explicit staggered term provisions). Similar surveys have also noted that ACUS lacks most of these

---

[23] The *Sourcebook* includes ACUS among a group of agencies outside of the EOP and executive departments that also includes, for example, the CIA, EPA, and Amtrak. *See Sourcebook* at 42, Table 3. The Executive Branch has long viewed Amtrak board members as removable at will. *See Holdover & Removal of Members of Amtrak's Reform Bd.*, 27 Op. O.L.C. 163, 1667-167 (2003); *accord Ass'n of Am. R.R.*, 575 U.S. at 53 (noting that Amtrak board members appointed to a five-year term were nonetheless "understood by the Executive to be removable by the President at will").

traditional indicia of independence, including statutory removal protection for Council members, partisan balance requirements, and any litigation, Congressional bypass, adjudicatory, or regulatory authority.  *See generally* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769 (2013); *see also id.* at 808 n.219 (observing ACUS "possess[es] neither adjudication nor rulemaking authority").[24]  Dissimilar from the court-like commission in *Wiener*, ACUS does not have the sort of agency structure that would warrant inferring removal protections where Congress otherwise chose not to include them.  *See Wiener*, 357 U.S. at 356.  The agency's duties, history, and structure all counsel against inferring such protections, and certainly offer no "affirmative evidence" Congress intended such a restriction.  *Swan*, 100 F.3d at 981 (declining to find such a restriction for NCUA and further explaining that "[w]hen Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear." (quoting *Armstrong*, 924 F.2d at 289)).  The Court should therefore reject Severino's claim that the Constitution limits the President's authority to remove ACUS Council members.  *See* Compl. ¶ 29.

### C.    The constitutional avoidance canon further counsels against reading removal protections into the Administrative Conference Act.

Though the Act's text is plain and no evidence exists that Congress intended to protect Council members from removal, the constitutional avoidance canon further supports denying Severino relief.  Under that canon, it is the "settled policy" of federal courts "to avoid an

---

[24] ACUS is, at times, casually referred to as an "independent" agency.  *See, e.g.*, ACUS, *About ACUS, available at* https://www.acus.gov/administrative-conference-united-states-acus (referring to ACUS as "an independent federal agency").  But as the *Sourcebook* itself explains, there "is no general, widely accepted definition of an independent agency."  *Sourcebook* at 42; *see also* Datla & Revesz, at 772, 824 (explaining that "independent agencies do not share a single form" and that the very term "independent agency" is "vaguely defined").  Most broadly, an "independent" agency is simply one, like ACUS that, though within the Executive Branch, is not located within the Executive Office of the President or one of the fifteen executive departments.  *See Sourcebook* at 43.  But in determining whether agencies are "classic independent regulatory commissions," courts have traditionally focused on the presence of "fixed terms with for-cause removal protections" rather than the "location" of the agency within the Executive Branch.  *Id.*; *see also* Datla & Revesz, at 772 (explaining independent agencies "are almost always defined as agencies with a for-cause removal provision"). Such explicit for-cause removal provisions are absent here.

interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Richardson v. United States*, 526 U.S. 813, 820 (1999) (quoting *Gomez v. United States*, 490 U.S. 858, 864 (1989)). Should the Court believe the Administrative Conference Act could be read to either provide tenure protections to Council members, or alternatively to restrict the President's presumptive removal power, it should reject that reading in view of the constitutional issues it would raise and adopt the more persuasive reading offered by Defendants.

The Supreme Court has cautioned that Congress's power to place limits on the President's constitutional authority to remove Executive officers is limited. *See Seila Law*, 140 S. Ct. at 2198-2200; *Free Enterprise Fund*, 561 U.S. at 492-498. In particular, the Court has expressed doubt about extending such Congressionally-mandated protections to "a new situation not yet encountered by the Court." *Free Enterprise Fund*, 561 U.S. at 483; *see also Seila Law*, 140 S. Ct. at 2211 (similar). Granting the statutory removal protections urged by Severino would, as a consequence, require the Court to assess the constitutionality of such protections. *Id.* Because the structure, history, and duties of ACUS are so far afield from earlier cases where the Court has either upheld or inferred such protections, *see supra* Section II.B, adopting Severino's strained reading of the Act would force the Judiciary to confront "a new situation not yet encountered by the Court," *Free Enterprise Fund*, 561 U.S. at 483, with respect to limits on Presidential removal power. In view of Congress's silence as to removal protections for Council members, and the specific nature and function of ACUS, this "new situation" would also "engender[] constitutional issues" concerning how ACUS Council members are appointed and removed. *Richardson*, 526 U.S. at 820; *see also Seila Law*, 140 S.Ct. at 2211; *Free Enterprise Fund*, 561 U.S. at 483.

The Court here has a convenient off ramp from that possible constitutional confrontation because the best, if not only, reading of the statute indicates that President Biden had the statutory authority to remove Severino. *See supra* Section II.A. Both *Free Enterprise Fund* and *Seila Law* required the Supreme Court to confront the constitutionality of explicit removal provisions that Congress chose to provide certain officers. *See Seila Law*, 140 S. Ct. at 2193 (describing statutory

removal protections for CFPB Director (citing 12 U.S.C. § 5491(c)); *Free Enterprise Fund*, 561 U.S. at 495-496 (describing statutory removal protections for PCOAB members (citing 15 U.S.C. § 7211(e)).  The Court is burdened with no such obligation here.  Whatever the scope of Congress's authority to provide removal protections, Congress plainly chose not to do so here, and no grounds exist to infer otherwise.  *See supra* Section II.B.  The Court therefore should not adopt Severino's strained reading of the statute only to run headlong into a fresh constitutional mire.  Instead it should apply the plain and ordinary meaning of the statute, avoiding an interpretation that would unnecessarily raise constitutional issues.  *See Richardson*, 526 U.S. at 820.

## <u>CONCLUSION</u>

For the reasons above, the Court should dismiss the complaint for lack of jurisdiction under Rule 12(b)(1) or, alternatively, for failure to state a claim under Rule 12(b)(6).

Dated May 4, 2021

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

CHRISTOPHER R. HALL
*Assistant Branch Director*

<u>/s/ Christopher D. Dodge</u>
CHRISTOPHER D. DODGE
(MA Bar No. 696172)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendants*